[No. E040627. Fourth Dist., Div. Two. July 10, 2008.]

STEPHEN McCARTY, Plaintiff and Appellant, v.
DEPARTMENT OF TRANSPORTATION, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IIIA., IIIB.3., IIIC. and IVC.

**COUNSEL**

Hollins • Schechter, Kathleen M. K. Carter, Andrew S. Hollins and Jeffrey R. Gillette for Plaintiff and Appellant.

Haight Brown & Bonesteel, Thomas N. Charchut, Maureen Haight Gee; Jones & Dyer and Gregory F. Dyer for Defendant and Appellant.

**OPINION**

**RICHLI, J.**—In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081], the California Supreme Court enunciated the "retained control" doctrine—that, as a matter of common law, one who hires an independent contractor may be liable for injuries to an employee of the independent contractor if the hirer not only retained control over safety conditions at the worksite, but also negligently exercised its retained control so as to affirmatively contribute to the employee's injuries. (*Id.* at pp. 202, 209–210.) In *Hooker*, as here, the defendant was the State of California, Department of Transportation (Caltrans)—a public entity. Under the Government Claims Act (Gov. Code, § 810 et seq.), "there is no common law tort liability for public entities in California; such liability is wholly statutory. [Citations.]" (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 688 [64 Cal.Rptr.3d 827]; see also Gov. Code, § 815.) Nevertheless, *Hooker* did not discuss what the statutory basis (if any) was for holding a public entity liable under the retained control doctrine. That task now falls to us.

Here, defendant Caltrans hired an independent contractor to build an extension of the I-210 freeway. That independent contractor employed plaintiff Steven McCarty as a heavy equipment operator. In 2001, McCarty was using an excavator to remove a utility pole from the freeway right-of-way when the pole fell on the roof of his excavator, hitting him in the back of the head and leaving him a near quadriplegic.

The seeds of this appeal were planted in McCarty's complaint. In his first cause of action, he alleged general negligence against Caltrans and other defendants; however, he further alleged that Caltrans was liable for such negligence under the Government Claims Act, under three theories: (1) respondeat superior liability (Gov. Code, § 815.2); (2) liability for the tort of an independent contractor (Gov. Code, § 815.4); and (3) liability for a dangerous condition of public property (Gov. Code, § 835). He went on to allege another cause of action against Caltrans for premises liability (a form of negligence), and yet another cause of action against Caltrans under the Government Claims Act. Thus, the first cause of action essentially encompassed the other two. Perhaps for this reason, by the time of trial, the parties and the trial court had largely abandoned the causes of action as pleaded in the complaint. Unfortunately, they never really agreed as to what causes of action had replaced them.

The trial judge purported to grant a nonsuit on the entire first cause of action. Nevertheless, he allowed the case to go to the jury on two alternative theories: liability for a dangerous condition of public property and liability

for the negligent exercise of retained control, pursuant to *Hooker.* The jury rejected the dangerous condition theory but found Caltrans liable under the retained control doctrine.

Caltrans then brought a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. The judge who had presided over the trial had retired; accordingly, a different judge heard these motions. He denied the motion for JNOV. However, he granted a partial new trial, ruling that the jury had not been properly instructed on the retained control doctrine.

Caltrans has appealed from the order denying its motion for JNOV. It has also filed a protective cross-appeal from the judgment. It contends that:

1. Any claim that a public entity negligently exercised its retained control must be brought under a statutory theory of either respondeat superior (Gov. Code, § 815.2) or a dangerous condition (Gov. Code, § 835). The trial court's order granting a nonsuit on the first cause of action, for negligence, eliminated the respondeat superior theory; the jury's finding that there was no dangerous condition eliminated the dangerous condition theory. Accordingly, the trial court should have granted JNOV for Caltrans.

2. There was insufficient evidence to support the jury's verdict finding Caltrans liable under the retained control doctrine.

McCarty has appealed from the order granting a partial new trial. He contends that:

1. The trial court erred by granting a new trial on a ground not specified in Caltrans's motion.

2. The trial court erred by granting a new trial because the jury had been instructed properly, on the retained control doctrine and otherwise.

3. Alternatively, even assuming the jury was not properly instructed, Caltrans forfeited and/or invited the error.

4. Again alternatively, even assuming a new trial was warranted, the trial court erred by granting a partial new trial, rather than a new trial on all issues.

We find no error. Hence, we will affirm.

# I

## FACTUAL BACKGROUND

Caltrans retained FCI Constructors, Inc. (FCI), to act as general contractor for the construction of an extension to the I-210 freeway. FCI was in control of the worksite and responsible for safety at the worksite. However, if Caltrans knew that FCI was doing something unsafe, it had the authority to order FCI to stop.

The freeway right-of-way belonged to Caltrans. Caltrans, not FCI, was responsible for clearing the right-of-way. However, Caltrans had a separate contract with Southern California Edison (Edison) under which Edison was responsible for removing its own utility poles. Edison, in turn, had subcontracted with Sturgeon Electric Company (Sturgeon) to actually remove the poles.

As Caltrans was aware, Sturgeon had specialized equipment for removing poles. It used boom trucks, which could be stabilized with outriggers. Boom trucks had "grabbers," a boom, a winch, and a cable. First, Sturgeon's workers used the grabbers to hold the pole in place. Next, they took a steel sling that ran from the boom and put it around the pole. Finally, they put a chain around the pole and used a hydraulic pole jack to pull it up out of the ground. The boom, supporting the pole via the cable and sling, could then lower the pole to the ground. As Caltrans was also aware, FCI did not have similar specialized equipment.

There was conflicting evidence with respect to whether FCI and Edison were allowed to communicate with each other directly. On one hand, FCI's contract provided that, whenever it needed to coordinate its work with the "rearrangement" of a utility, it was responsible for contacting the utility company. Also, Caltrans held regular utility meetings, attended by representatives of both FCI and Edison, at which they could communicate with each other and coordinate their work. Moreover, representatives of FCI and Edison could talk "in passing" at the worksite.

On the other hand, Billy Rojas of Caltrans, who was its designated liaison with Edison, testified: "[FCI] has to work through [Caltrans] and then from [Caltrans] they work through Edison. [*FCI*] *is not allowed to or is not supposed to work directly with Edison* so I'm the million dollar man there." (Italics added.)

In any event, it was essentially undisputed that, regardless of what the contract provided, Caltrans did "assist" FCI by communicating with Edison

in order to coordinate FCI's work with Edison's. Indeed, Caltrans had an entire "utility relocation department" that was "responsible for interfacing with the utility companies to ensure the timely removal" of utilities. Thus, at least in practice, as Billy Rojas also testified, "Everything went through [Caltrans]."

The particular utility pole in this case was one of 14 located north of Baseline Road in Claremont. They belonged to Edison. However, they were located in the freeway right-of-way, which belonged to Caltrans. They carried not only electrical lines, but also fiber-optic telecommunications lines. They all had to be removed before FCI could perform its work in the area. Originally, Caltrans was scheduled to have them removed by August 31, 2000. For various reasons, however, this date was repeatedly postponed, causing FCI to fall behind schedule.

The pole at issue was much larger than an ordinary electrical or telephone pole. When it was installed, it was about 70 feet long. Under Edison's policies and practices, as well as under American National Standards Institute (ANSI) standards, a utility pole (if it has guy wires, which this pole did) should be set at a depth of 10 percent of its height, plus one and a half feet. Thus, a 70-foot-long pole should be set eight and a half feet deep.[1] This particular pole, however, was set just four feet two inches deep on one side and five feet six inches deep on the opposite side. Like all Edison poles, it had a metal tag affixed 13 feet from the bottom, so it was possible to tell whether the pole was at the proper depth by measuring the distance from the tag to the ground.

By December 21, 2000, Sturgeon had removed all of the electrical lines from the pole. However, it still could not remove the pole, because Edison was having trouble identifying and contacting the owner of the communication lines. Sturgeon did top off the pole just above the communication lines, leaving it about 39 feet long. A 39-foot pole need only be set about five and a half feet deep.

FCI was anxious to have the pole removed because it could be required to pay liquidated damages of $35,000 for every day it was late in completing its work. Moreover, it had to bear the cost of any idle equipment. FCI suggested to Caltrans that, once the communication lines came down, it could remove the pole itself.

Accordingly, on January 4, 2001, Caltrans told FCI to remove the pole, setting January 12 as the date for the removal. It agreed to pay FCI extra.

---

[1] Under general order No. 95 of the Public Utilities Commission, a 70-foot-long pole should be set seven and a half feet deep.

When January 12 rolled around, however, the communication lines were still up, so FCI could not remove the pole.

Finally, Edison managed to contact the owner of the communication lines, and on January 16, those lines came down. On January 17, Edison notified Sturgeon, which responded that it would remove the pole on either Friday, January 19, or Monday, January 22.

Edison had already told Caltrans that, as soon as the communications lines came down, Sturgeon would remove the pole in just a couple of days. Nevertheless, Caltrans did not tell FCI that Sturgeon was going to remove the pole. Quite the contrary, also on January 17, Caltrans told FCI to remove the pole "as soon as possible . . . ."

McCarty worked for FCI. He had 15 years of experience as a heavy equipment operator. However, he had never removed a similarly sized utility pole before.

On January 18, 2001, McCarty's supervisor told him to remove the pole. Previously, a Caltrans representative had told McCarty's supervisor "to just let [the pole] fall out of the hole . . . ." McCarty began by using an excavator[2] to remove dirt from one side of the pole. After he had removed three or four scoops of dirt, he was just swinging back to remove another when the pole fell, crushing the cab of his excavator and hitting him in the back of the head.

McCarty was left a near quadriplegic, with complete paralysis from the chest down and weakness in his arms and hands.

There was substantial evidence that Caltrans had never told Edison that it was going to have FCI remove the pole. Allan Tanjuaquio of Caltrans claimed that he spoke to Nancy Floyd of Edison, and she told him it would be okay for FCI to remove the pole. Nancy Floyd, however, did not remember any such conversation. Ed McCann of Edison testified that Edison never authorized Caltrans to remove the pole.

## II

### PROCEDURAL BACKGROUND

McCarty's complaint, as subsequently amended, named as defendants Caltrans, Edison, Sturgeon, Kobelco, and Hertz. Prior to trial, McCarty

---

[2] Kobelco America, Inc. (Kobelco), was the manufacturer of the excavator. Hertz Equipment Rental (Hertz) had leased the excavator to FCI.

entered into settlements with Edison, Sturgeon, Kobelco, and Hertz. Accordingly, when the trial began, the only defendant was Caltrans.

The complaint asserted eight causes of action. However, only three causes of action ultimately went to the jury:[3]

First cause of action, captioned "Negligence." It alleged that "[d]efendants and each of them" negligently performed or failed to perform various specified acts. However, it further alleged that Caltrans's liability under the first cause of action was based on Government Code sections 815.2, 815.4, and 835; it included additional allegations with respect to why Caltrans was liable under these sections.

Third cause of action, captioned "Negligence (Premises Liability)." It alleged that "[d]efendants and each of them" owned or controlled the property on which the accident occurred and negligently used, maintained, or managed that property. It then further alleged that Caltrans's liability under the third cause of action was based on Government Code section 835, and it included additional allegations with respect to why Caltrans was liable under this section.

Fifth cause of action, captioned "Violation of Government Code §§ 815.2, 815.4, 830, 835, 835.2 and 840.2." Basically, it incorporated or repeated the earlier allegations regarding Caltrans, then added an allegation that McCarty had complied with the claims presentation requirements of the Government Claims Act.

Judge Frederick A. Mandabach presided over the trial.

Toward the end of McCarty's case-in-chief, Caltrans filed a written motion for nonsuit. Caltrans argued that (1) it was entitled to discretionary immunity (see Gov. Code, §§ 815.2, subd. (b), 820.2); (2) it could not be held liable under the retained control doctrine because it did not affirmatively contribute to the accident; and (3) it could not be held liable on a dangerous condition of public property theory because it did not own or control the pole (see Gov. Code, § 830, subd. (c)). McCarty filed a written opposition.

---

[3] The second cause of action, captioned "Negligence Per Se," alleged that Caltrans and other defendants violated general order No. 95 of the Public Utilities Commission, relating to the installation depth of utility poles. The trial court, however, refused McCarty's request for jury instructions on this cause of action, and McCarty has not argued that this was error.

The fourth cause of action, captioned "Breach of Implied Warranty," alleged that Caltrans and other defendants furnished inaccurate plans and specifications. It does not appear that McCarty introduced any evidence to support this cause of action or requested any jury instructions on it.

The sixth, seventh, and eighth causes of action did not name Caltrans as a defendant.

Initially, Judge Mandabach denied the motion. However, counsel for McCarty had requested jury instructions on general negligence. (CACI No. 400 et seq.) During an instructions conference, counsel for Caltrans objected to these, arguing that any general negligence claim was barred by discretionary immunity. (Gov. Code, § 820.2.) At the end of the conference, Judge Mandabach announced that he wanted to hear further argument on the motion for nonsuit. He explained that he had not realized that McCarty was asserting general negligence, as opposed to premises liability and/or a dangerous condition of public property; hence, he had not considered whether Caltrans could claim discretionary immunity as a defense to McCarty's general negligence claims. After hearing further argument, Judge Mandabach granted a partial nonsuit, solely "as to the first cause of action for general negligence."

By special verdict, the jury found:

"1. Did Caltrans own or control the property?

"[✓] Yes __No

"If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

"2. A. Was an unsafe condition created by or known to Caltrans that was not a known condition that FCI Constructors was hired to correct or repair?

"or

"B. Did Caltrans retain control over safety conditions at the worksite and through its actions or failure to take actions it was required to take contribute to Steve McCarty's injuries?

"If your answer to either question 2A or 2B is yes, then you must mark yes. If your answer to both question 2A and 2B is no, you must mark no.

"[✓] Yes __No

"If your answer to question 2 is yes, then answer question 3. If your answer to question 2 is no, then answer question 4.

"3. Was Caltrans' conduct a substantial factor in causing Steve McCarty's harm?

"[✓] Yes ___No

"Go to question 4.

"4. Was the property in a dangerous condition at the time of the incident?

"___ Yes [✓] No."

The jury also found that McCarty's damages totaled $17,439,431.65. Finally, it apportioned fault 31 percent to Caltrans, 42 percent to FCI, zero percent to Edison, and 27 percent to McCarty.

Subsequently, Judge Mandabach retired.[4] The case was reassigned, at least temporarily, to Judge Craig S. Kamansky. Judge Kamansky entered judgment in favor of McCarty and against Caltrans. The case was then reassigned to Judge Donald G. Umhofer.

Caltrans filed a motion for JNOV. It argued that Judge Mandabach had correctly granted a nonsuit[5] on the first cause of action, because there was insufficient evidence that any employee of Caltrans had been negligent and because Caltrans had established discretionary immunity as a matter of law. It also argued that there was insufficient evidence to support the verdict under the retained control doctrine.

Even though Judge Umhofer had not presided over the trial, Caltrans did not file a complete reporter's transcript of the trial testimony. Instead, it filed excerpts of the testimony of one witness, and it lodged a complete transcript of that witness's testimony.

In opposition, counsel for McCarty testified that, upon receiving the motion, they "undertook to identify various witnesses that provided testimony to support the verdict. We were informed by each responsible court reporter that they were unable to provide the required transcripts on time . . . . As such, . . . McCarty is rendered unable to provide transcripts of all of the testimony . . . which provides a plethora of evidence in support of his verdict."

In its reply, Caltrans asserted: "[W]hatever facts were established during the trial in this case, those facts do not support liability against a public entity, <u>as a matter of law</u>. Substantial evidence is not relevant because there is no legal theory which supports liability of a public entity in this case." It

---

[4] We take judicial notice that Judge Mandabach retired on January 31, 2006.

[5] Caltrans incorrectly characterized the nonsuit as a directed verdict.

went on to argue that Judge Mandabach's order granting a nonsuit, when combined with the jury's finding that there was no dangerous condition, precluded it from being held liable under the retained control doctrine, as a matter of law.

Caltrans also filed a motion for new trial.

Judge Umhofer denied the motion for JNOV. He explained: "The trial judge's grant of nonsuit on the negligence cause of action . . . and his giving of CACI 1009 [concerning the retained control doctrine] seem at odds. It must, however, be inferred that at some point he became convinced that there was sufficient evidence to go to the jury on one species of negligence, to wit, negligent exercise of retained control. It [is] supposed then that he gave only a partial nonsuit on the first cause of action. . . . [D]efendant argues that there was no evidence of any employee affirmative contribution to the plaintiff's injuries. The trial judge heard the evidence and ruled otherwise by reason of his inclusion of CACI 1009. In view of the trial judge's total unavailability at the time of these motions, the parties will have to abide by that decision."

At the same time, Judge Umhofer granted the motion for new trial in part, solely with respect to Caltrans's liability under the retained control doctrine; otherwise, he denied the motion.

## III

## CALTRANS'S APPEAL

### A. *Caltrans's Briefs.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *The Denial of Caltrans's Motion for JNOV.*

Caltrans contends that Judge Umhofer erred by denying its motion for JNOV. First, it argues that the jury was improperly allowed to hold Caltrans liable under the retained control doctrine in the absence of any statutory basis for public entity liability. Second, it argues than Judge Umhofer improperly relied on Judge Mandabach's rulings, rather than reviewing the record himself. Before we can address these arguments, we must discuss what the retained control doctrine is; then we must discuss how it applies to a public entity defendant.

---

*See footnote, *ante,* page 955.

1. General legal principles.

a. *The retained control doctrine.*

i. *The general rule: nonliability.*

"At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work. [Citations.] Central to this rule of nonliability was the recognition that a person who hired an independent contractor had ' "no right of control as to the mode of doing the work contracted for." ' [Citations.]" (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693 [21 Cal.Rptr.2d 72, 854 P.2d 721].)

This general rule of nonliability is stated in section 409 of the Restatement Second of Torts (Restatement), which provides: "[T]he employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." This general rule, however, is subject to numerous exceptions. (*Privette v. Superior Court, supra*, 5 Cal.4th at p. 693.) Such exceptions are set forth in sections 410 through 429 of the Restatement.

ii. Privette: *The hirer is not liable to the contractor's employees under the peculiar risk exception.*

One such exception is the peculiar risk doctrine, which applies when the person who hires the independent contractor knows or should know that the contractor's work is likely to create a peculiar risk of physical harm to others unless special precautions are taken. (*Privette v. Superior Court, supra*, 5 Cal.4th at p. 695.) The peculiar risk doctrine is set forth in sections 413 and 416 of the Restatement.

In *Privette*, the California Supreme Court held that a person who hires an independent contractor is *not* liable under the peculiar risk doctrine *to the contractor's employees*. (*Privette v. Superior Court, supra*, 5 Cal.4th at p. 692.) Thus, it created an exception to the peculiar risk doctrine (which, as already noted, is itself an exception to the general rule of nonliability).

The court explained that there is a "conflict between the peculiar risk doctrine, as applied in favor of the contractor's employees, and the system of workers' compensation." (*Privette v. Superior Court, supra*, 5 Cal.4th at p. 691.) "[T]he rule of workers' compensation exclusivity . . . should equally protect the property owner who, in hiring the contractor, is indirectly paying

for the cost of such coverage, which the contractor presumably has calculated into the contract price." (*Id.* at p. 699.)

■ "[T]o allow an independent contractor's employees who incur work-related injuries compensable under the workers' compensation system to also seek damages under the doctrine of peculiar risk from the person who hired the contractor would give those employees an unwarranted windfall. . . . [T]o permit such recovery would give these employees something that is denied to other workers: the right to recover tort damages for industrial injuries caused by their employer's failure to provide a safe working environment. This, in effect, would exempt a single class of employees, those who work for independent contractors, from the statutorily mandated limits of workers' compensation. [Citations.] Moreover, to impose vicarious liability for tort damages on a person who hires an independent contractor for specialized work would penalize those individuals who hire experts to perform dangerous work rather than assigning such activity to their own inexperienced employees. [Citations.]" (*Privette v. Superior Court, supra,* 5 Cal.4th at pp. 699–700.)

Also, that windfall would come at the expense of the hiring party's right to indemnification. Ordinarily, "[a] person held liable under the doctrine of peculiar risk is entitled to equitable indemnity from the independent contractor at fault for the injury. [Citations.]" (*Privette v. Superior Court, supra,* 5 Cal.4th at p. 695.) "This ensures that the ultimate responsibility for the harm caused by the peculiar risk of the work done is borne by the individual or entity at fault for the injury. But when the person injured is an employee of the independent contractor, the exclusivity provisions of the workers' compensation scheme shield the negligent contractor from an action seeking equitable indemnity. [Citation.] . . . [A]ffixing liability without indemnification places an onerous burden on someone who is 'fault-free.' [Citation.]" (*Id.* at p. 701, quoting *Anderson v. Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 242–243, fn. 2 [125 Cal.Rptr. 640].)

iii. Toland: *The hirer is not liable to the contractor's employees under either the "direct" or the "vicarious" form of the peculiar risk exception.*

*Privette* had indicated that the peculiar risk doctrine was a form of vicarious liability. (*Privette v. Superior Court, supra,* 5 Cal.4th at pp. 695 & fn. 2, 700.) It had also indicated that part of the reason for barring an action by an employee of an independent contractor against the hirer was that the hirer was "nonnegligent" (*id.* at pp. 692, 698, 701) or " 'fault-free.' " (*Id.* at p. 701, quoting *Anderson v. Chancellor Western Oil Dev. Corp., supra,* 53 Cal.App.3d at pp. 242–243, fn. 2.)

Accordingly, in *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504], the plaintiff argued that *Privette* applied only to the "vicarious" form of the peculiar risk doctrine, as set forth in section 416 of the Restatement, and did not apply to the "direct" form, as set forth in section 413 of the Restatement. (*Toland*, at p. 264.)

As the court in *Toland* explained: "Section 413 of the Restatement . . . reads: 'One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer [¶] (a) fails to provide in the contract that the contractor shall take such precautions, or [¶] (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.' [Citation.] Because section 413 rests the liability of the hiring person on his or her omission to provide for special precautions in the contract or in some other manner, it is sometimes described as a rule of 'direct liability.' [Citations.]" (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th at p. 259.)

By contrast, "[s]ection 416 of the Restatement . . . provides: 'One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.' [Citation.] . . . [¶] Because the hiring person's liability under section 416 . . . flows from the independent contractor's negligent failure to take special precautions in performing the inherently dangerous work, as required by 'the contract or otherwise,' the hiring person's liability is often referred to as 'vicarious liability.' [Citations.]" (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th at p. 260, fn. omitted.)

The court concluded, however, that "this distinction is misleading, for liability under these sections is neither purely direct nor purely vicarious." (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th at p. 264.) "[U]nder both sections 413 and 416 [of the Restatement], the hiring person's liability is cast in the form of the hiring person's breach of a duty to see to it that special precautions are taken to prevent injuries to others; in that sense, the liability is 'direct.' Yet, peculiar risk liability is not a traditional theory of direct liability for the risks created by one's own conduct: Liability under both sections is in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor, because it is the

hired contractor who has caused the injury by failing to use reasonable care in performing the work." (*Id.* at p. 265.)

"*Privette* . . . bars employees of a hired contractor who are injured by the contractor's negligence from seeking recovery against the hiring person, *irrespective* of whether recovery is sought under the theory of peculiar risk set forth in section 416 or section 413 of the Restatement . . . . In either situation, it would be unfair to impose liability on the hiring person when the liability of the contractor, the one primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage." (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th at p. 267.)

"As we concluded in *Privette,* . . . it is illogical and unfair that a landowner or other person who hires an independent contractor should have greater liability for the independent contractor's negligence towards the contractor's employees than the independent contractor whose liability is limited to providing workers' compensation coverage. Imposing on the hiring person a liability greater than that incurred by the independent contractor (the party with the greatest and most direct fault) is equally unfair and illogical whether the hiring person's liability is premised on the theory of section 413 . . . or the theory of section 416 [of the Restatement] . . . ." (*Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th at p. 270.)

> iv. Hooker: *The hirer may or may not be liable to the contractor's employees under the retained control exception.*

■ Another exception to the general rule of nonliability may be called the retained control exception. This exception is set forth in section 414 of the Restatement, which provides: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

In *Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, the Supreme Court held that a person who hires an independent contractor *may or may not* be liable to the contractor's employees under this exception. "[A] hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but . . . a hirer is liable to an employee of a contractor insofar as a hirer's exercise of retained control *affirmatively contributed* to the employee's injuries." (*Id.* at p. 202.)

It explained: "[B]ecause the liability of the contractor, the person primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage, it would be unfair to impose tort liability on the hirer of the contractor merely because the hirer retained the ability to exercise control over safety at the worksite. In fairness, . . . the imposition of tort liability on a hirer should depend on whether the hirer *exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at p. 210.)

"Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette* [and] *Toland* . . . because the liability of the hirer in such a case is *not* ' "in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor." ' [Citation.] To the contrary, the liability of the hirer in such a case is *direct* in a much stronger sense of that term." (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at pp. 211–212, fn. omitted, quoting *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1244 [108 Cal.Rptr.2d 617, 25 P.3d 1096], quoting *Toland v. Sunland Housing Group, Inc., supra*, 18 Cal.4th at p. 265.)

The court then went on to hold that, in the case before it, Caltrans had not affirmatively contributed to the injuries to its independent contractor's employee. (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at pp. 214–215.) The employee had been operating a crane on an overpass. The crane was equipped with stabilizing outriggers. However, when the outriggers were extended, it blocked the overpass. Accordingly, the employee would regularly retract the outriggers to allow other vehicles to use the overpass. On one occasion, he retracted the outriggers, then failed to reextend them before operating the crane; the crane tipped over, and he was killed. (*Id.* at p. 202.) Caltrans was responsible for safety on the worksite, and it had the power to correct any unsafe conditions. (*Ibid.*) Caltrans representatives knew that crane operators were retracting their outriggers from time to time and that it was unsafe to operate a crane with retracted outriggers. (*Id.* at pp. 202–203.)

The court stated: "We are not persuaded that Caltrans, by *permitting* traffic to use the overpass while the crane was being operated, *affirmatively contributed* to [the employee]'s death." (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at p. 215.) It noted that under the analogous " ' "active participation" ' " standard, used in Utah, " 'a principal employer is subject to liability for injuries arising out of its independent contractor's work if the employer is actively involved in, or asserts control over, the manner of performance of the contracted work. [Citation.] Such an assertion of control

occurs, for example, when the principal employer *directs* that the contracted work be done by use of a certain mode or otherwise interferes with the means and methods by which the work is to be accomplished. [Citations.]' [Citation.] To repeat, Caltrans did *not* direct the crane operator to retract his outriggers to permit traffic to pass." (*Id.* at p. 215, quoting *Thompson v. Jess* (1999) 1999 Utah 22 [979 P.2d 322, 327].) Thus, "there was no evidence Caltrans's exercise of retained control over safety conditions at the worksite affirmatively contributed to the adoption of that practice by the crane operator. There was, at most, evidence that Caltrans's safety personnel were aware of an unsafe practice and failed to exercise the authority they retained to correct it." (*Hooker*, at p. 215.)

In a footnote, however, the court cautioned: "[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 212, fn. 3.)

### b. *Governmental tort liability.*

■ Under the Government Claims Act, "there is no common law tort liability for public entities in California; such liability is wholly statutory. [Citations.]" (*In re Groundwater Cases, supra,* 154 Cal.App.4th at p. 688; see also Gov. Code, § 815.) Hence, McCarty cannot hold Caltrans liable under ordinary negligence principles. He can hold it liable under the retained control doctrine if, and only if, the jury's findings regarding that doctrine also give rise to governmental tort liability.

McCarty alleged that Caltrans was liable under three statutory theories.

First, he alleged respondeat superior liability under Government Code section 815.2. This statute provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee . . . ." (*Id.,* subd. (a).)

Second, he alleged independent contractor liability under Government Code section 815.4. This statute provides: "A public entity is liable for injury proximately caused by a tortious act or omission of an independent contractor of the public entity to the same extent that the public entity would be subject to such liability if it were a private person. Nothing in this section subjects a

public entity to liability for the act or omission of an independent contractor if the public entity would not have been liable for the injury had the act or omission been that of an employee of the public entity." (*Ibid.*)

Third, he alleged liability for a dangerous condition of public property under Government Code section 835. This statute provides: "[A] public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835.)

A "dangerous condition" is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).)

> 2. The interrelationship of the retained control doctrine and governmental tort liability.

This brings us to the question of how the retained control doctrine interrelates with governmental tort liability. Can a public entity be held liable under the retained control doctrine? And if so, under which section(s) of the Government Claims Act?

Even though in *Hooker*, Caltrans was the defendant, the discussion largely ignored Caltrans's public entity status. Rather, *Hooker* framed the question presented as "whether an employee of a contractor may sue the hirer of a contractor for the tort of negligent exercise of retained control set forth in section 414 [of the Restatement]. Section 414 provides: 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.' " (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 201, fn. & italics omitted.) Thus, liability under the retained control doctrine is a species of common law negligence.

The *Hooker* court then held that liability under the retained control doctrine requires that the hirer must exercise its retained control so as to *affirmatively contribute* to the employee's injuries. (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at pp. 202, 209–210.) It further held that merely permitting traffic to use the overpass while the crane was being operated did not constitute the necessary affirmative contribution. (*Id.* at pp. 214–215.) Ordinarily, as a matter of common law negligence, it would be enough that the hirer's exercise of its retained control was a *substantial factor* in *bringing about* the employee's injuries. (Rest., § 431; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968–969 [67 Cal.Rptr.2d 16, 941 P.2d 1203].) Accordingly, the affirmative contribution requirement is a *limitation* on the liability that the hirer would *otherwise* have. (See *Michael v. Denbeste Transportation, Inc.* (2006) 137 Cal.App.4th 1082, 1096–1097 [40 Cal.Rptr.3d 777]; see also *Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th 1334, 1344, fn. 2 [26 Cal.Rptr.3d 433].)[6]

■ Once again, a public entity cannot be held liable for common law negligence. Thus, a public entity cannot be held liable under section 414 of the Restatement, *standing alone*. However, Government Code section 815.4 provides: "A public entity is liable for injury proximately caused by a tortious act or omission of an independent contractor of the public entity *to the same extent that the public entity would be subject to such liability if it were a private person*." (Italics added.) This wording is not limited to situations in which the public entity is *vicariously liable* for the independent contractor's tort. It applies any time the public entity is liable for an injury *proximately caused* by the independent contractor's tort.

The Law Revision Commission comments to Government Code section 815.4 state: "The California courts have held that public entities—and private persons, too—may at times be liable for the acts of their independent contractors. Snyder v. Southern Cal. Edison Co., 44 Cal.2d 793 [285 P.2d 912] (1955) (discussing general rule) [citation]. This section retains that liability." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 815.4, p. 207. In turn, the cited case, *Snyder v. Southern Cal. Edison Co.*, noted: ". . . 'The general rule of nonliability of an employer for the acts of an independent contractor is subject to numerous exceptions,' " specifically citing sections 410 through 429 of the Restatement. (*Snyder*, at

---

[6] In *Hooker*, Justice Werdegar dissented precisely because she believed that the hirer should be liable, as a matter of common law negligence, even in the absence of any affirmative contribution. She argued that, while the absence of any affirmative contribution by the hirer may mean that the hirer is less at fault than the independent contractor (or than the injured employee him- or herself), a jury should be allowed to take account of this by applying standard principles of comparative fault. (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at pp. 215–218 (dis. opn. of Werdegar, J.).)

p. 797.) Thus, it appears that the Legislature intended public entities to be subject to liability under all such exceptions, including section 414 of the Restatement.

And, of course, under section 414 of the Restatement and under *Hooker*, a private person who hires an independent contractor can be liable for an injury to an independent contractor's employee, even when the injury is proximately caused by an act or omission of the independent contractor, provided the private hirer (1) retained control over safety conditions at the worksite and (2) negligently exercised that retained control so as to affirmatively contribute to the employee's injuries.

We therefore conclude that a public entity can be held liable under the retained control doctrine, provided all the other prerequisites of public entity liability under Government Code section 815.4 are also present. This means that the employee's injury must have been proximately caused by a tortious act or omission of the independent contractor. In this case, this prerequisite was satisfied, because the jury found that FCI was 42 percent at fault.

We now come—at long last—to Caltrans's actual contention. According to Caltrans, the only way a public entity can be held liable under the retained control doctrine is either (1) as a matter of respondeat superior (Gov. Code, § 815.2), or (2) as a matter of a dangerous condition of public property (Gov. Code, § 835). It argues that, by granting a nonsuit on the first cause of action, Judge Mandabach essentially eliminated the respondeat superior theory; and, by finding no dangerous condition of public property, the jury essentially eliminated the dangerous condition theory. Thus, it complains that it was held liable for pure common law negligence, untethered to any provision of the Government Code.

For the reasons just stated, we disagree. The jury could still properly find Caltrans liable under the retained control doctrine by way of Government Code section 815.4.

■ Judge Mandabach indicated that he was granting the nonsuit based on discretionary immunity. The respondeat superior theory makes a public entity derivatively liable for its employees' torts. The relevant statute provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee . . . ." (Gov. Code, § 815.2, subd. (a).) However, "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Gov. Code, § 815.2, subd. (b).) The discretionary immunity statute

then provides: "[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." (Gov. Code, § 820.2.) Hence, the public entity cannot be derivatively liable under the respondeat superior theory if the relevant public employee had discretionary immunity.

■ By contrast, under the independent contractor theory, the public entity's liability is not derivative of the liability of any particular public employee. Admittedly, the retained control doctrine requires some negligence on the part of the public entity—it must negligently exercise its retained control so as to affirmatively contribute to the injuries to the employee of the independent contractor. It is arguable, however, that it is the public entity, not any particular public employee, that has the retained control and, hence, that has the duty to exercise that retained control nonnegligently. If so, then the public entity can be negligent in this respect, even in the absence of any negligent public employee. In any event, even assuming that, whenever the public entity negligently exercises its retained control, some particular public employee is likewise negligent, the fact that that employee is immune under Government Code section 820.2 does not block the public entity's liability under Government Code section 815.4; the public entity may be liable, even if the public employee is not.

To the extent that the public entity's liability under the independent contractor theory is derivative at all, it is derivative of the liability of the independent contractor. Thus, Government Code section 815.4 provides: "Nothing in this section subjects a public entity to liability for the act or omission of an independent contractor if the public entity would not have been liable for the injury had the act or omission been that of an employee of the public entity." Hence, if the *independent contractor* was exercising discretion within the meaning of Government Code section 820.2, the public entity cannot be liable under Government Code section 815.4. Here, however, in arguing the motion for nonsuit, counsel for Caltrans expressly conceded that FCI and its employees were not exercising discretion for immunity purposes.

■ We therefore conclude that, even assuming Judge Mandabach correctly ruled that the respondeat superior theory was barred by discretionary immunity, McCarty's claim based on the retained control doctrine, as made applicable to public entities under Government Code section 815.4, was not barred. Accordingly, Judge Umhofer correctly denied Caltrans's motion for JNOV. We need not decide whether the retained control doctrine could *also* give rise to public entity liability on a respondeat superior theory under Government Code section 815.2 or on a dangerous condition of public property theory under Government Code section 835.

Caltrans also argues that the jury instructions and the special verdict form concerning the retained control doctrine were erroneous. In part IVB., *post*, however, we will hold that the jury instructions were erroneous (for reasons other than those that Caltrans is now asserting) and, hence, that Judge Umhofer correctly granted a partial new trial. We therefore need not reach this contention.

Finally, in this appeal, McCarty argues for the first time that a public entity can be held liable under the retained control doctrine under Government Code section 814, which deals with liability based on contract, and/or Government Code section 895.2, which deals with joint and several liability under an agreement. McCarty forfeited any reliance on either of these statutes by failing to assert them below, either by alleging them in his complaint or otherwise. We therefore express no opinion on their applicability.

 3. *Judge Umhofer's stated grounds for denying the motion for JNOV.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

 C. *The Sufficiancy of the Evidence to Support the Jury's Verdict Under the Retained Control Doctrine.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV

McCARTY'S APPEAL

McCarty contends that the trial court erred by granting Caltrans's motion for new trial.

 A. *Additional Factual and Procedural Background.*

 1. *The instructions conference.*

At an instructions conference, counsel for Caltrans objected to Judicial Council of California Civil Jury Instructions (2004) CACI No. 400 ("Negligence—Essential Factual Elements"), arguing that a public entity could not be liable for general negligence. In response, counsel for McCarty argued:

---

[*]See footnote, *ante*, page 955.

"[T]he Hooker decision . . . would make a CACI instruction proper on the issue of negligence . . . ." (Boldface omitted.)

Counsel for Caltrans also objected to all instructions in the CACI No. 1000 series, which deals in general with premises liability; this included CACI former No. 1009,[9] which dealt specifically with the retained control doctrine. He argued that the use note to the CACI No. 1000 series stated that those instructions should not be given with respect to a public entity defendant; in such a case, the CACI No. 1100 series, dealing with a dangerous condition of public property, should be given instead.

Caltrans further argued that both CACI No. 400 and the CACI No. 1000 series were inappropriate because it had discretionary immunity.

Judge Mandabach pointed out that the CACI No. 1100 series did not include any instruction analogous to CACI former No. 1009. Counsel for Caltrans then objected to CACI No. 1009 on the ground that it did not refer to "affirmative" contribution; he argued that, if Judge Mandabach were to instruct on the retained control doctrine at all, he should use either Caltrans's own special instruction or BAJI No. 8.30, rather than CACI No. 1009. Judge Mandabach nevertheless ruled that he would give CACI No. 1009. He refused to give Caltrans's requested special instruction.

Toward the end of the conference, Judge Mandabach granted the partial nonsuit on the first cause of action.

Counsel for Caltrans then agreed that some instructions in the CACI No. 400 series, dealing with general negligence, should be given, but only as to "contributory fault . . . ."

### 2. *The instructions given.*

Ultimately, Judge Mandabach gave some general negligence instructions (CACI Nos. 400, 401, 405, 406, 411, 413, 415); however, these were drafted so that the jury was to apply them only to determining the comparative negligence of FCI, Edison, and McCarty himself.

Concerning the retained control doctrine, Judge Mandabach gave CACI former No. 1009, modified so as to state:

"Steve McCarty claims that he was harmed by an unsafe condition while working on Cal Trans' property. To establish this claim Steve McCarty must prove all of the following. . . .

---

[9] CACI former No. 1009 has since been replaced by CACI Nos. 1009A and 1009B.

"1. That Cal Trans owned or controlled the property;

"2. The unsafe condition was created by or known to Cal Trans and was not a known condition that FCI Constructors was hired to correct or repair; or [¶] . . . [¶]

"[]That Cal Trans retained control over safety conditions at the work site and[,] through its actions or failure to take actions it was required to take, contributed to Steve McCarty's injuries[;]

"3. That Steve McCarty was harmed; and

"4. That Cal Trans' conduct was a substantial factor in causing Steve McCarty's harm."

### 3. *Caltrans's motion.*

Caltrans filed a notice of intention to move for a new trial under Code of Civil Procedure section 657, causes (1) through (7). In its memorandum of points and authorities it argued, among other things, that Judge Mandabach had erred by giving CACI former No. 1009 and that the special verdict form was "flawed."

### 4. *Judge Umhofer's ruling.*

At the hearing on the motion, Judge Umhofer indicated that he intended to grant the motion on the ground that "the special verdict, as well as CACI 1009, completely failed to include an element of negligence. [¶] . . . [¶] And there's absolutely no tie in the jury instructions to CACI 401[,] which is just a simple definition of negligence." Counsel for McCarty responded that Caltrans had invited this error by objecting to negligence instructions.

Judge Umhofer granted the motion, citing Code of Civil Procedure section 657, cause (7) ("[e]rror in law, occurring at the trial and excepted to by the party making the application"). He explained: "The special verdict and CACI 1009 did not properly instruct the jury and require findings consistent with the law of negligent exercise of retained control as articulated by the Supreme Court in *Hooker* . . . . In a word, neither made mention of the element of negligence[,] either with respect to the unsafe condition or the actions/omissions regarding safety at the job site (Questions 2.A. and 2.B.). . . . CACI 401 that defines negligence was not given in conjunction with CACI 1009, only with reference to the comparative fault of plaintiff and others. . . . [¶] . . . [¶]

"Cal Trans did not invite instructional error by broadly objecting to CACI 401 and the 1000 and 1100 series. It was simply part of their continuing argument that plaintiff failed to prove negligence . . . ."

B. *The Granting of a New Trial.*

McCarty argues that Judge Umhofer erred by granting the new trial motion on a ground that had not been stated in Caltrans's motion. Caltrans had not specifically argued that Judge Mandabach had erred by failing to give negligence instructions (such as CACI No. 401) in connection with the retained control doctrine. Nevertheless, this was the main reason that Judge Umhofer gave for granting the motion.

 It has been said that "the motion for new trial can only be granted on a ground specified in the notice of intention to move for a new trial." (*Wagner v. Singleton* (1982) 133 Cal.App.3d 69, 72 [183 Cal.Rptr. 631].) Moreover, on appeal, an order granting a new trial can be affirmed only "if it should have been granted upon any ground *stated in the motion* . . . ." (Code Civ. Proc., § 657, italics added.) In this context, however, "ground" does not mean "issue." Rather, it refers to the broad, boilerplate statutory grounds listed in Code of Civil Procedure section 657, such as an "[e]rror in law . . . ." (Code Civ. Proc., § 657, cause (7).)

We rejected an identical argument in *Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862 [26 Cal.Rptr.2d 446] (Fourth Dist., Div. Two). There, defendant Snowline moved for a new trial, listing all seven statutory grounds. (*Id.* at p. 865.) The trial court granted the motion because it had " 'botched the jury instructions.' " (*Id.* at pp. 865–866.) On appeal, the plaintiff argued "that instructional error was not a proper basis for granting the motion for new trial because Snowline did not rely on such error in its memorandum of points and authorities in support of the motion. However, Snowline did list error in law as one of the bases for its motion in its notice of motion. . . . [L]isting error in the notice of intention to move for new trial is sufficient to place the issue before the trial court." (*Id.* at pp. 870–871; accord, *Neal v. Montgomery Elevator Co.* (1992) 7 Cal.App.4th 1194, 1198 [9 Cal.Rptr.2d 497].)

Here, Caltrans moved for a new trial based on (among other things) an error in law, citing (among other things) Code of Civil Procedure section 657, cause (7). Judge Umhofer then granted the motion based on an error in law, citing Code of Civil Procedure section 657, cause (7). Thus, the motion *was* "granted on a ground specified in the notice of intention to move for a new trial." The fact that it happened to be a *different* error in law is not necessarily fatal to the grant.

McCarty also argues that Judge Umhofer erred because Caltrans did not "except[] to" the asserted error (see Code Civ. Proc., § 657, cause (7)); indeed, it affirmatively *objected* to negligence instructions. Again, we disagree.

Code of Civil Procedure section 657, cause (7) allows the trial court to grant a motion for new trial based on an "[e]rror in law, occurring at the trial and excepted to by the party making the application." However, an appellant is deemed to have excepted to "giving an instruction [or] refusing to give an instruction"; an objection is not required. (Code Civ. Proc., § 647; see also *Butler-Rupp v. Lourdeaux* (2005) 134 Cal.App.4th 1220, 1230 [36 Cal.Rptr.3d 685].)

Under the doctrine of invited error, " '[w]here a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79], quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 383, p. 434.) The trial court, however, has the power to grant a new trial based on even an invited error. " 'If error appears in the record, the power of the trial court to grant a new trial is not limited by the conduct of the parties in inviting such error. On an appeal from a judgment, defendant's position would be tenable, but not so when an appeal is from an order granting a new trial. [Citations.] . . . ". . . [W]here the jury has been erroneously instructed and the trial court has determined that the error was prejudicial, we do not believe that it is precluded from granting a new trial merely because there may be said to be a waiver or an estoppel on the part of one of the parties. [Citation.] To hold otherwise would mean that the trial court, by reason of the action of the parties, would be powerless to correct what might be an obvious miscarriage of justice." ' " (*Conroy v. Perez* (1944) 64 Cal.App.2d 217, 226–227 [148 P.2d 680], quoting *Springer v. Sodestrom* (1942) 54 Cal.App.2d 704, 707 [129 P.2d 499], quoting *Nieves v. Vigolino* (1933) 135 Cal.App. 763, 765 [27 P.2d 916]; accord, *Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 [40 Cal.Rptr. 78, 394 P.2d 822]; *Hand Electronics, Inc. v. Snowline Joint Unified School Dist., supra,* 21 Cal.App.4th at p. 871; *Neal v. Montgomery Elevator Co., supra,* 7 Cal.App.4th at p. 1198; *Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 346 [126 Cal.Rptr. 731].)

Finally, McCarty argues that the instructions on the retained control doctrine were adequate and correct as given. We disagree.[10] As we held in

---

[10] Caltrans does Judge Umhofer a great disservice by failing to defend his ruling on this point. It stakes out the position that there was absolutely no way that it could be held liable under the retained control doctrine, and therefore Judge Umhofer should have granted its motion for JNOV. It evidently scorns to argue that, *even if* it could be held liable under the

part IIIB.2., *ante*, under Government Code section 815.4, a public entity can be held liable under the retained control doctrine, provided a private person would be liable under the same circumstances. This means that the public entity must *negligently* exercise its retained control so as to affirmatively contribute to the injuries of the employee of the independent contractor. Here, the jury was not so instructed. It was given CACI former No. 1009, which did not contain any negligence requirement and did not require the jury to find that Caltrans failed to use reasonable care. To the contrary, this instruction allowed Caltrans to be held liable as long as it "contributed" to McCarty's injuries.

The jury was also given CACI No. 401, which defined negligence generally, as the "failure to use reasonable care to prevent harm to one self [*sic*] or to others." However, because CACI former No. 1009 did not refer to negligence, the jury had no way of knowing that it should consider CACI No. 401 in connection with the retained control doctrine. Moreover, CACI No. 401 went on to state, "You must decide how a reasonably careful person or company would have acted in *FCI Constructors', Southern California Edison's or Steve McCarty's* situation." (Italics added.) This implied that the jurors had no need to consider whether *Caltrans* acted reasonably.

McCarty argues that CACI Nos. 406, 411, and 413 effectively made up for the deficit in CACI former No. 1009. CACI No. 406 provided: "More than one person or entity's fault[,] including Steve McCarty[,] may have been a substantial factor in causing Steve McCarty's harm. If so, you must decide how much responsibility each person or entity has by determining[,] on a percentage basis, the extent to which his or its fault contributed to causing the harm." "Fault," however, was not defined; certainly it was not defined in terms of negligence. The jury would have understood Caltrans's fault to be defined, as in CACI No. 1009, in terms of its "contribut[ion]" to McCarty's injuries.

CACI No. 411, as given here, provided: "Every person has a right to suspect [*sic*] that every other person will use reasonable care[,] unless he or she knows or should know that the other person will not use reasonable care." However, because CACI former No. 1009 did not refer to reasonable care, the jury had no reason to apply this instruction to Caltrans. At most, it might have concluded that it could hold Caltrans liable *either* under CACI No. 1009 *or* for failure to use reasonable care.

---

retained control doctrine, the instructions on the retained control doctrine were erroneous, and therefore Judge Umhofer properly granted its motion for new trial. Thus, we are left to analyze McCarty's argument without Caltrans's assistance.

Finally, CACI No. 413, unlike the other negligence instructions, did refer to Caltrans; it stated: "You may consider custom and practice in the community in deciding whether Cal Trans, FCI Constructors, Southern California Edison, or Steve McCarty acted reasonably." Once again, however, CACI former No. 1009 did not require the jury to decide whether Caltrans acted reasonably. If the jury applied this instruction to Caltrans at all, it may have done so in connection with CACI No. 1104, regarding the dangerous condition theory; it required the jury to consider "whether [Caltrans] had a reasonable inspection system and whether a reasonable system would have revealed the dangerous condition." The jury had no reason, however, to apply it to the retained control doctrine.

"Whether the erroneous instruction was prejudicial was a question for the trial court on motion for new trial; and having granted the new trial, it must be presumed that the trial court considered that it was and that it resulted in a miscarriage of justice." (*Conroy v. Perez, supra*, 64 Cal.App.2d at p. 225.) "As a general proposition, the determination as to whether an erroneous instruction was prejudicial and justifies the granting of a new trial is one which is left to the trial court's discretion, and where a motion is granted upon that ground, the order will not be disturbed unless it appears that there has been an abuse of that discretion." (*Parker v. Womack* (1951) 37 Cal.2d 116, 123 [230 P.2d 823], overruled on other grounds in *Butigan v. Yellow Cab Co.* (1958) 49 Cal.2d 652, 660 [320 P.2d 500].) McCarty has not even attempted to argue that the evidence of negligence was so overwhelming that the instructional error was harmless; he has not so much as provided us with a statement of facts. Accordingly, he cannot show that the trial court abused its discretion by finding prejudice.[11]

We therefore conclude that Judge Umhofer did not err by granting a partial new trial on the retained control doctrine.

C. *The Scope of the New Trial.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[11] At oral argument, McCarty did contend that Caltrans did not supply Judge Umhofer with an adequate record to support a finding of prejudice. "We need not consider an argument not mentioned in the briefs and raised for the first time at oral argument. [Citation.]" (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027, fn. 2 [18 Cal.Rptr.3d 1].)

*See footnote, *ante*, page 955.

V

## DISPOSITION

The orders appealed from are affirmed. The protective cross-appeal from the judgment is moot. In the interests of justice, each side shall bear its own costs on appeal.

Ramirez, P. J., and Miller, J., concurred.

A petition for a rehearing was denied August 6, 2008, and the petitions of both appellants for review by the Supreme Court were denied October 16, 2008, S166028.