Filed 3/3/16  Harrison v. County of San Mateo CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| RODNEY HARRISON,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SAN MATEO,<br><br>        Defendant and Respondent. | A140671<br><br>(San Mateo County<br>Super. Ct. No. CIV516997) |


The issue in this case is whether the County of San Mateo (County), which participates in a countywide interdepartmental gang task force, is liable in negligence to the victim of a vehicle accident allegedly caused by a city police officer also participating in the task force.  The trial court granted summary judgment to the County on grounds the officer was an employee of the city, not the County.  The court also based its ruling in part on public policy.  Imputing vicarious liability to the County, it decided, would discourage counties from participating in such coordinated multi-jurisdictional efforts to combat gang-related crime.  The injured motorist appeals, contending there are triable issues of fact concerning the employment or agency relationship of the parties, and arguing the public policy exception to vicarious liability applied by the trial court is not authorized under California law.

We conclude based on undisputed facts that the officer was not acting as an employee or agent of the County when the accident occurred and that public policy properly factors into the determination whether the county owed a duty of care to the plaintiff.  Finding no error, we affirm the summary judgment on behalf of the County.

1

## BACKGROUND

On May 19, 2012, appellant Rodney Harrison was riding his motorcycle in the company of two other motorcyclists on Highway 101 south in South San Francisco. At the time, Officer Joseph Dal Porto of the Foster City Police Department was driving an unmarked patrol car owned by the Town of Colma, with Officer Brett Murphy of the Burlingame Police Department riding in the passenger seat. The officers were temporarily on loan for one week from their respective departments to the San Mateo Countywide Gang Task Force (GTF). Also present in the Colma police vehicle was Probation Officer Oscar Avelar, who had been assigned to the GTF by his regular supervisor.

The three motorcyclists appeared to be speeding. The two other than Harrison wore "full patch" vests indicating they were members of the Outlaw Motorcycle Gang. Officers Dal Porto and Murphy decided to follow them to clock their speed. When Dal Porto determined they were going approximately 85 miles per hour, he decided to initiate a traffic stop in the fast lane (number one lane) of the freeway. Harrison slowed his motorcycle to approximately 40 miles per hour, while the other two motorcyclists continued at a high rate of speed. Officer Dal Porto decided to stop Harrison rather than pursue the other two, which would have involved a high speed chase.

After Dal Porto activated his lights and siren, and as he was pulling Harrison over, a traffic accident ensued which sent Harrison's motorcycle skidding out of control across the freeway from the number one lane to the number five lane. Harrison sustained multiple injuries, the most serious requiring the amputation of his right leg below the knee. There is some disagreement as to exactly how the accident transpired. Harrison claims Dal Porto's vehicle struck his motorcycle from the rear. The County contends Harrison's motorcycle collided with another car when he attempted to change lanes. The details of the accident are not pertinent to the issues on appeal.

Harrison sued various individuals and entities on general negligence and vehicular negligence theories, including as defendants Officers Dal Porto and Murphy, the cities of Foster City and Burlingame and their police departments, the Town of Colma, and most

significantly for present purposes, the County, the San Mateo County Sheriff's Office (Sheriff's Office) and the GTF.[1]  Harrison ultimately dismissed the Town of Colma from the action and settled with the individual officers and the cities.

In August 2013, the County (on its own behalf and on behalf of GTF and the Sheriff's Office) moved for summary judgment, claiming it owed no duty to Harrison.  In December 2013, the court granted the motion for summary judgment because (1) Dal Porto was neither an employee nor agent of the County; (2) the County did not own the vehicle driven by Dal Porto and therefore could not be liable for negligent entrustment; and (3) it would be against public policy to extend vicarious liability to the County for negligence of individual officers on loan to the GTF from participating city police departments.

## DISCUSSION

Harrison argues on appeal, first, the GTF was a discrete entity or an organ of the Sheriff's Office, and as such was Dal Porto's employer.  He seems to suggest intergovernmental task forces are subject to special rules that favor imposition of liability.  Second, he argues that even if the GTF was not a discrete entity, the Sheriff's Office exercised sufficient control over the GTF's patrolmen, like Dal Porto, to establish the County as Dal Porto's joint or special employer.  And finally, even if there was not an employer-employee relationship between Dal Porto and the County, the County nevertheless owed a duty to Harrison because Dal Porto was an independent contractor and agent for whose negligence the County was vicariously liable.

### I.      The Legal Standards

Summary judgment provides courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.  (Code Civ. Proc., § 437c, subd. (f)(2); *Aguilar v. Atlantic*

---

[1] The County answered the first amended complaint by averring in part that GTF and the San Mateo County Sheriff's Office were not separate, legally cognizable entities. The municipal defendants answered that the police departments were not legally cognizable entities.

*Richfield Co.* (2001) 25 Cal.4th 826, 843.) It may be granted only if the court finds there is "no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo, viewing the evidence in a light most favorable to the party opposing the motion, and drawing all reasonable inferences and resolving any evidentiary doubts or ambiguities in his favor. (*County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, 467.) We independently determine whether the record supports the trial court's conclusions and are not bound by the trial court's reasoning. (*Ibid.*)

The County's summary judgment motion was based in part on the claim that it owed no duty of care to Harrison. That question raises an issue of law reviewed de novo (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 (*Merrill*); *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265) because the decision whether a duty should be imposed on the defendant is one involving policy considerations, not purely issues of fact (*Merrill*, *supra*, at p. 477; *Peter W. v. San Francisco Unified School District* (1976) 60 Cal.App.3d 814, 821–822).

Although issues of employment and agency, which are at the heart of the present dispute, are normally factual determinations left to the jury, where the evidence is not in conflict and does not give rise to conflicting inferences, it is appropriate to resolve the issue on summary judgment. (*Caso v. Nimrod Productions, Inc.* (2008) 163 Cal.App.4th 881, 889 [plaintiffs were special employees as a matter of law]; *Cockrell v. United States* (S.D. Cal. 1999) 101 F.Supp.2d 1291, 1292–1298 [no special employment as a matter of law].)

## II.     The Evidence in Support of and in Opposition to the Motion

In support of its motion for summary judgment, the County submitted a declaration of Captain Thomas Gallagher, a 26-year veteran of the Sheriff's Office, who was familiar with the formation and operations of the GTF, as well as excerpts from various depositions in the case. It is undisputed that in December 2006, in order to address countywide gang problems, the Board of Supervisors of the County passed a resolution authorizing the Sheriff to enter into participation agreements with local law

4

enforcement agencies to form the GTF (Resolution). The County's Resolution attached a form of proposed Agreement For Participation in the San Mateo County Gang Task Force (Agreement), which was drafted by the County. The sample Agreement was never executed by the County or Foster City, or apparently by the other cities.[2] Captain Gallagher described the GTF as "an initiative of all the police chiefs and law enforcement officials, including state and federal agencies, who work within the borders" of the County.

The Incident Commander and Watch Commander assigned to the GTF, who exercise active supervision over the GTF's operations on any given day, rotate weekly from among all the participating police departments and the Sheriff's Office. On the

---

[2] The trial court sustained a relevancy objection to Harrison's proposed undisputed material fact about the existence of the hold harmless provision on grounds it was derived from the unsigned Agreement. That ruling is challenged on appeal by Harrison, along with several other evidentiary rulings. To the extent the court below ruled that all content of the Agreement was inadmissible as irrelevant, we disagree. The unsigned Agreement, though not legally binding, remains relevant to show the intent of the participants in the GTF as to the proposed allocation of legal liability among them. (Evid. Code, §§ 210, 351; see *Munson Transp. v. Hajjar* (7th Cir. 1998) 148 F.3d 711, 715; *Tyco Thermal Controls, LLC v. Redwood Industrials, LLC* (N.D.Cal. July 9, 2012, SBA Nos. C 06-7164, 10-1606) 2012 U.S. Dist. LEXIS 94793, at pp. *9–*11.) The Resolution itself states that the sample Agreement "specif[ies] the parties['] expectations and understandings relative to their participation in the task force." This implicit understanding of the parties is relevant to the nature of the inter-jurisdictional relationships, even though the Agreement was never signed. We therefore reverse the trial court's ruling excluding evidence of the hold harmless provision in the Agreement.

We affirm the trial court's ruling sustaining relevancy objections to Harrison's undisputed facts 10, 12 and 17 on grounds that the Government Code sections under which the Agreement would have been authorized had it been executed, as well as the County's "wishe[s]" with respect to its collaboration with the other participants, are irrelevant. For that reason we do not discuss further Harrison's argument that, because the County cited Government Code sections 54981 and 55631 in the Agreement, it must have intended the participating cities to be performing County work. We also agree with the trial court that it was irrelevant whether any Sheriff's Office personnel responded to the accident scene after the crash. We further affirm its ruling sustaining the County's objection to Harrison's undisputed material fact No. 36 on grounds that the County's answers in discovery clearly disputed that Dal Porto was a County employee and its failure to make an explicit denial in its answer is irrelevant.

5

particular date in question Lieutenant Remedios of the South San Francisco Police Department was the Incident Commander in charge of general GTF deployment. Sergeant Jordan of the Colma Police Department was the Watch Commander for the "North Team," on which Officers Dal Porto and Murphy were serving.

It is undisputed the GTF owns no patrol vehicles, and the police officers assigned to the GTF generally drive vehicles owned by their home departments. In this instance a Foster City patrol car was not available, so the officers were in a car owned by the Colma Police Department. Officer Dal Porto was dressed in his Foster City police officer's uniform, with no indication he was working on the GTF. Perhaps most significantly, Officer Dal Porto was being paid by Foster City at the time of the accident, not by the County or the GTF.

With respect to organization of the GTF, Captain Gallagher declared the "Sheriff is co-equal with all the other police chiefs." Harrison does not dispute that "[t]he Sheriff does not command the GTF; all of the police chiefs and the Sheriff meet and jointly to discuss operational use." The GTF organization chart[3] also shows the Sheriff and the police chiefs sharing equal status at the top of the chart, where they worked collaboratively.

Additionally, the Agreement (see fn. 2, *ante*) provided, "No Party shall be responsible for the acts and omissions of another Party's officers or employees nor shall a Party incur any liabilities arising out of the activities of another Party's officers or employees." It further provided that "no party's employees acquire any of the rights, privileges, powers, or advantages of any other party's employees." Likewise, each party was "responsible for its own equipment and personnel, and for the full payment for and

---

[3] The organization chart is contained in a manual attached to Harrison's opposition papers, which documented the formation of the GTF and set forth certain of its general policies (Manual). He claims the Manual was "designed and disseminated" by the County. The Manual itself does not indicate authorship. Though the Manual was produced in discovery by the County, Harrison points to no statement under oath that it was drafted by the County. For purposes of this appeal, we will accept as true that it was a County-prepared document.

6

compensation of said equipment and personnel." Each party to the Agreement was expected to commit resources and personnel to the common purpose of combating gang violence throughout the County. Each party was required to continue paying its own personnel while they were serving on the GTF, to pay workers' compensation insurance for its own employees, and to maintain $5 million in insurance for general negligence and $5 million in insurance for vehicular negligence. Had it been executed, the Agreement would have required the signatories each to hold the others harmless for any liabilities arising out of the activities of its own officers or employees. The Agreement leaves no doubt the participating entities intended they should each be liable for the torts of their own employees, but not for the torts of another entity's employees.

### III. Dal Porto Was Not an Employee or Agent of the County

#### A. *Dal Porto was an employee of Foster City, not the County*

Harrison argues the County owed him a duty of care because it was Officer Dal Porto's employer. Ordinarily an employer, including a public entity employer, is vicariously liable for the acts of its employee in the scope and duration of employment. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 715; *Martinez v. Hagopian* (1986) 182 Cal.App.3d 1223, 1227; Gov. Code, § 815.2, subds. (a) & (b).) It is undisputed that Officer Dal Porto was an employee of Foster City. Harrison presented no evidence that Dal Porto had a formal employment relationship with the County or with the GTF. The County did not select Dal Porto to work on the GTF. The Foster City Police Department made that decision. Foster City also apparently provided Dal Porto's uniform and other supplies. Dal Porto continued to receive his regular paycheck from Foster City while he worked on the GTF, and there was no evidence he received any compensation or benefits from the County. The trial court properly found no triable issue on whether Dal Porto was a County employee.

#### B. *The GTF is not a discrete entity or an organ of the Sheriff's Office*

Harrison nevertheless claims the GTF is a discrete entity vicariously liable for Dal Porto's alleged negligence, pointing out the GTF had a "separate and distinct purpose and mission as well as an independent and functional management and control body." But

7

that is not enough to make it a separate and discrete entity. In *Hervey v. Estes* (9th Cir. 1995) 65 F.3d 784, upon which Harrison relies, the Ninth Circuit determined that the Tahoma Narcotics Enforcement Team (TNET) was not a separate and distinct entity subject to suit under 42 U.S.C. section 1983 because it was "composed of several local, county, and state governmental entities," and the plaintiff failed to show the law enforcement agencies intended to create a separate legal entity when they joined together to combat narcotics trafficking. (*Id*. at pp. 791–792.) The considerations it took into account show that the TNET operated in a similar fashion to the GTF: "TNET does not have an operating budget as an independent entity. Its member entities retain responsibility for the employment, salary, benefits, and terms and conditions of all employees. Finally, the Agreement creating TNET, signed by all member entities, provides that 'for the purposes of indemnification of the unit personnel and their participating jurisdictions against any losses, damages, or liabilities arising out of the services or activities of the unit, the personnel so assigned by any jurisdiction shall be deemed to be continuing under the employment of that jurisdiction and its policing department.' " (*Id.* at p. 792.) *Hervey v. Estes* does not help Harrison. Although it does say in dictum that the component members of the TNET could be sued and could be held jointly and severally liable (*ibid.*), we choose not to follow that dictum without further examination.

Although Harrison invokes a purported "special case" for recognizing task forces as separate entities, we find no such rule exists and applying the appropriate test strongly favors not recognizing the GTF as such. *McKee v. Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force* (2005) 134 Cal.App.4th 354 (*McKee*) held an intergovernmental crime-fighting task force was a "local agency" and its board of directors and executive council were "legislative bodies" as defined by the Ralph M. Brown Act (Gov. Code, § 54950 et seq.), making them subject to the requirement that their meetings be public (*McKee*, *supra*, at pp. 357–364). The agreement creating L.A. Impact, the task force involved in *McKee*, specified that the parties intended to create a separate entity (*id*. at p. 359), and the factual indicia that L.A. Impact operated as a

8

separate entity were strong.  L.A. Impact was "governed by a board of directors and executive council, with operations conducted under a separate command structure."  (*Id.* at p. 360.)  It was a "fiscally separate entity" with a $9 million operating budget, funded "through public grants routed through member cities, through contributions of personnel and equipment contributed by member cities, and primarily through the division of the proceeds of seized assets . . . ."  (*Ibid.*)  It was authorized to enter into contracts and in fact had purchased a rotorcraft.  (*Ibid.*)  L.A. Impact was also expressly created as a "joint powers authority" under Government Code, section 6500 et seq.  (*Id.* at p. 357.)  "L.A. Impact only constitutes a public agency if it was formed under the Joint Exercise of Powers Act."  (*Id.* at p. 359; see Gov. Code, § 6500.)

In contrast, the documents in the case before lead us to believe the GTF is not a separate entity subject to suit.  Neither the Resolution nor the Agreement suggests an intention to create a separate entity (cf. *McKee*, *supra*, 134 Cal.App.4th at p. 359), and neither mentions the Joint Exercise of Powers Act.  There is no evidence the GTF had a separate budget or that it benefited as an entity from the seizure of assets during GTF operations.  And the Agreement, far from suggesting an employment relationship would exist between the GTF and the officers serving on it, specified that "the work/services performed" by participants on the GTF were to be performed as independent contractors, thereby implicitly invoking the general rule of non-liability for the torts of an independent contractor.  (*Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1188, fn. 5 (*Benson*); *McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 970 (*McCarty*).)

The evidence of the GTF's governance structure shows it was under the authority of appointees from each participating department, including the Sheriff's Office.  A separate command structure for the GTF did exist in which the Sheriff's Office participated but did not control other entities or individuals.  Throughout the organization chart for the GTF, sheriff's personnel share authority with police personnel, and at no point in the chart does the Sheriff appear to wield authority over the chiefs.  Sheriff's personnel directly oversee police personnel only when they are assigned individually to

9

serve as Incident Commander or Watch Commander for the week. The GTF's oversight function was assigned to the San Mateo County Police Chiefs and Sheriff Association, with "direct oversight" by the San Mateo County Police Chiefs and Sheriff Association Countywide Issues Committee Liaison Chiefs. The only designation on the chart whose name seems to point solely to the Sheriff's Office is the participation of the San Mateo County Sheriff's Gang Intelligence Unit (GIU), reporting to the Incident Commander, but even that unit was in fact staffed by both sheriff's personnel and police personnel.[4] These factors clearly differentiate GTF from L.A. Impact.

Besides *McKee*, the other case prominently cited by Harrison is *Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 423–424 (*Coastside*), which held a task force was an arm of a government agency in a completely different context. Harrison argues the GTF likewise was an "arm of the Sheriff's Office." The issue in *Coastside* was whether proposals for regulations that came from the California Marine Life Protection Act Blue Ribbon Task Force (Task Force), created by the Department of Fish & Game (DFG) and the California Resources Agency, had come from "individuals" or "organizations" outside the government agencies, which would have required further review, or whether the proposals came from the agencies themselves, which would not have required such review. (*Id*. at pp. 421–423; see Pub. Res. Code, §§ 36800, 36870, 36900.)

*Coastside* concluded the proposals were properly viewed as coming from the agencies themselves rather than from an outside organization because the Secretary of the California Resources Agency appointed the members of the Task Force and the DFG

---

[4] The purpose of the GIU was to "establish a centralized database that contains relevant information on known criminal enterprises and street gangs currently active in San Mateo County," and to disseminate that information to the Sheriff's Office and police chiefs throughout the County. One role of the GIU was to "debrief known gang members to gain intelligence and information on criminal activity." The GIU also was in charge of developing the curriculum for an eight-hour training course each officer participating in the GTF was required to take before deployment. Although the GIU developed the curriculum, the actual trainers could be of any rank and from any of the participating police departments or the Sheriff's Office.

10

played an extensive role in developing the proposals, including appointing stakeholders and Task Force advisors and fully participating in the work of the Task Force by assigning key personnel to assist, establishing feasibility criteria, helping to guide the work flow, providing staff support and technical resources for the advisors and stakeholders, and presenting the Task Force's recommendation for a preferred alternative to the Fish & Game Commission. (*Coastside*, *supra*, 215 Cal.App.4th at pp. 423–424.) The agency took the position the Task Force was "an arm of the DFG" rather than an outside organization (*id.* at p. 423), and the court agreed, because the Task Force was a "creation" of the government agencies and was performing "governmental functions." (*Id.* at p. 424.) The Court of Appeal found "the Task Force was not the type of outside organization contemplated by [Public Resources Code] sections 36870 and 36900." (*Ibid.*)

Simply outlining the attributes of the DFG's control over the Task Force, as we have done, illustrates the significant differences between *Coastside* and the case before us. Neither the Sheriff's Office nor the County appointed the participants on the GTF. Rather, each participating entity appointed its own representatives in the command structure of the GTF and designated personnel to staff the GTF on a weekly basis. Likewise, neither the County nor the Sheriff's Office exercised detailed control over the GTF such as was exercised by the DFG in *Coastside*. Thus, *Coastside* is distinguishable both factually and legally.

More closely on point is *Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195 (*Brassinga*), which involved a negligent shooting of one police officer by another while both were working on a regional strategic weapons and tactics team (SWAT team) comprised of officers from three neighboring police departments. (*Id.* at p. 202.) The officer killed, Officer Brassinga, was not a member of the SWAT team and had been participating solely as a role player for the other officers' training. (*Ibid.*) He was a reserve officer with the Palo Alto Police Department, armed with a toy gun supplied by his own department, and was paid for his participation by Palo Alto. (*Id.* at p. 203–204.) During one of the role playing scenarios a Mountain View police officer

11

who was a member of the SWAT team shot and killed Brassinga after neglecting to inspect his weapon in advance to determine if it was loaded.  (*Id.* at pp. 203, 206.)

When Brassinga's heirs sued, Mountain View claimed Brassinga was either its own or the SWAT team's "special employee" and sought to limit the heirs' recovery to amounts payable under the Workers' Compensation Act.  (*Brassinga*, *supra*, 66 Cal.App.4th at pp. 208–209.)  The Sixth District held the SWAT team did not qualify as Brassinga's employer for workers' compensation purposes because it did not qualify as an " 'employer' " under Labor Code section 3300, which includes " "[e]ach county, city, district, and *all public and quasi public corporations and public agencies therein*.' "  (*Id.* at pp. 210–211.)  The SWAT team was also concededly not a joint powers authority with independent existence.  (*Id.* at p. 211.)  Hence, the Sixth District held the SWAT team was not a separate entity employing Brassinga.  (*Id.* at p. 213.)  We, too, conclude, as a matter of law, the GTF was not a separate and discrete entity subject to suit by Harrison.

C.  *The County was not a joint or special employer of Dal Porto*

With respect to the County's liability, Harrison's primary legal theory is that the County and Foster City "jointly employed Dal Porto."  He further claims a "special employment" relationship existed between the County and Dal Porto.  We understand these to be essentially equivalent arguments.

The concept of dual employment has long been recognized in California. " ' "Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or 'general' employer and a second, the 'special' employer." ' "  (*Brassinga*, *supra*, 66 Cal.App.4th at p. 209.)  "The key to the existence of a special employment relationship is control.  '[W]here the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other.'  (*Marsh v. Tilley Steel Co.* [(1980)] 26 Cal.3d [486,] 493.)  It is only where some measure of control over the employee is relinquished by the employee's general

12

employer to another entity that the other entity may become the employee's special employer." (*Id.* at pp. 215–216.)

The factors to determine whether a special employment relationship exists were identified in *Kowalski v. Shell Oil Company* (1979) 23 Cal.3d 168: (1) whether the borrowing employer exercised control over the details of the employee's work; (2) whether the work was part of the borrowing employer's regular business; (3) whether the borrowing employer furnished the employee's work tools; (4) whether the borrowing employer had the right to fire the employee;[5] (5) whether the borrowing employer had the obligation to pay the employee; (6) whether the work for the borrowing employer lasted for a considerable length of time; (7) whether the employee provided skilled as opposed to unskilled labor; and (8) whether the employee consented to the special employment relationship. (*Id*. at pp. 176–178.) "On the other hand, a special employment relationship may be negated by evidence that '[t]he employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer.' " (*Brassinga*, *supra*, 66 Cal.App.4th at p. 217, quoting *Marsh v. Tilley Steel Co.*, *supra*, 26 Cal.3d at p. 492 (*Marsh*).) Employing these criteria, we conclude the County was not a special employer of Dal Porto as a matter of law.[6]

---

[5] *Villanazul v. City of Los Angeles* (1951) 37 Cal.2d 718, 721, emphasized the right to terminate service as a "strong circumstance tending to show the right to control."

[6] The finding of a special employment relationship must be made with due caution because it has ramifications beyond the issues immediately before the court. (*CHP*, *supra*, 60 Cal.4th at p. 1008, fn. 2.) For instance, the special employer becomes liable for workers' compensation benefits, and those benefits become the employee's exclusive remedy against the employer for workplace injuries. (*Ibid*.) A special public employee is entitled to assert claims under the California Fair Employment and Housing Act, and may raise defenses available to government employees in actions by third parties. (*Ibid*.) Also, in some circumstances a special public employee may be entitled to benefits under California's Public Employees' Retirement System. (*Ibid*.)

*Brassinga*, *supra*, 66 Cal.App.4th 195 also dealt with the question whether the city of Mountain View was Brassinga's special employer. Finding the evidence on the *Kowalski* factors to be "mixed," *Brassinga* held it could not be determined as a matter of law that Mountain View either was or was not a special employer of Brassinga. (*Id.* at pp. 216–220.) In favor of finding a special employment relationship, the Sixth District found the SWAT team training exercises were part of the regular business of the participating police departments, that the role playing services provided by Brassinga were unskilled, and that Mountain View had the power to remove Brassinga from his role-playing duties, although it did not have authority to fire him. (*Id.* at p. 218.) Weighing against a special employment relationship were the facts that Palo Alto, not Mountain View, was paying Brassinga, the alleged special employment period was brief, and Palo Alto supplied Brassinga with the toy gun. (*Ibid.*) Because the evidence, while undisputed, gave rise to conflicting inferences, the case was not properly resolved on summary judgment. (*Id.* at p. 221.)

But the services provided by Dal Porto in the present case were much more skilled, and there is no evidence the County had the right to remove Dal Porto from his GTF assignment, much less fire him. Based on the *Kowalski* factors, we conclude as a matter of law that Dal Porto was not a special employee of the County. (See *Cockrell v. United States*, *supra*, 101 F.Supp.2d at p. 1298 [ U.S. government was not, as a matter of law, the special employer of airplane pilots who collided mid-air after engaging in aerial fire suppression activities on federal land].)

The first *Kowalski* factor—the right to control the details of the alleged special employee's work—has recently been identified by the Supreme Court as "the primary factor in determining any employment relationship, including special employment." (*State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1012 (*CHP*); see *Marsh*, *supra*, 26 Cal.3d at p. 492 ["The special employment relationship and its consequent imposition of liability upon the special employer flows from the borrower's power to supervise the details of the employee's work."].)

Here there is no evidence to support Harrison's necessary contention that the County had control over the details of Dal Porto's job performance. Although Harrison tries to argue the Sheriff's Office was an umbrella organization with oversight powers over other participants in the GTF, the evidence shows all the entities were co-equals, with none exercising powers superior to the others.

Harrison points to the following evidence to support his theory of a special employment relationship: (1) the County spearheaded the formation of the GTF through the adoption of the Resolution; (2) it drafted the Agreement; (3) the Agreement required participants to "commit resources and assign law enforcement officers to the Sheriff's Gang Enforcement Unit," thereby implying the Sheriff had some superior position of control over what was to become the GTF; (4) the County "designed and disseminated" an operational Manual for the GTF (see fn. 3, *ante*); and (5) the County had its own employees and agents in position throughout the command structure of the GTF, including the GIU. (See fn. 3, *ante*.)

But even if the County initiated the formation of the GTF by authorizing the Sheriff to move the plan forward, the structure of the GTF described in the County-drafted Agreement is not amenable to the interpretation that the Sheriff's Office exercised control over the city police entities, much less over individual officers' compliance with city or county guidelines. The County itself, as an entity, contributed human resources and some assets to the common endeavor, but Harrison has been unable to produce any evidence the County exercised any sort of supervisorial power over the officers deployed to the GTF. We have already discussed why these factors prevent us from finding a genuine factual dispute as to whether GTF was a separate and discrete entity. The same factors tend to negate the argument that the County was a joint or special employer of Dal Porto. (See *Brassinga*, *supra*, 66 Cal.App.4th at p. 217.)

It is also undisputed that no one from the County or the Sheriff's Office was directing Dal Porto's action or GTF's operations at the time of the accident. The officers in charge were from the South San Francisco and Colma police departments. Officer Dal Porto himself made the decision to pursue the speeding motorcyclists and to pull them

15

over, and he decided how to pull them over. And the Foster City Police Department made the decision to assign Dal Porto to the GTF for the week.

The most that can be said in favor of Harrison's theory that the County exercised control over Dal Porto's job performance is that the County may have "designed and disseminated" an operational Manual for the GTF, which covered basic policies, but left detailed matters of job performance to the discretion of the participating entities and officers. (See fn. 3, *ante*.) To the extent he suggests the content of the Manual itself raises a factual issue as to whether the County exercised control over the details of Dal Porto's job performance, we find it cannot reasonably be so read.

The Manual includes general operational instructions to personnel working on the GTF, including a section on "Initiating Pursuit" and "Forcible Stops Tactics." With respect to traffic stops, the Manual provides general guidance, such as "discourag[ing]" the use of certain techniques to forcibly stop a vehicle. It further instructs, however: "In those instances wherein a conflict arises between a department pursuit policy and the countywide protocol, the departmental policy will take precedence." This same understanding was reiterated more bluntly in the declaration of Captain Gallagher: "The GTF does not have policies and procedures regarding how to make traffic enforcement stops, but permits the officers to follow the policies and procedures promulgated by their own departments." Thus, the County's policies were subordinate to those of each police department with respect to its own employees. The County did not control the details of Dal Porto's work.

The second *Kowalski* factor, whether the work was part of the County's regular business, also argues against the existence of a special employment relationship. The GTF constituted an experimental new approach to law enforcement against gang members, which several regional cities, as well as the County, joined on a voluntary, collaborative basis. The County did not borrow Dal Porto to do its ordinary work. Officer Dal Porto was not performing as a deputy sheriff of the County; he was acting as a Foster City police officer on GTF duty.

16

The third factor—whether the alleged special employer supplied the tools and equipment for the tortfeasor—again weighs in favor of finding no special employment relationship. The car Dal Porto drove was supplied by the Colma Police Department. Dal Porto's uniform, badge and weapons were apparently supplied by the Foster City Police Department. There is no evidence the County provided him with any of his equipment.

Fourth, we must ask whether the County had the power to fire Dal Porto, and the answer appears to be no. It is undisputed that Dal Porto was employed by Foster City, and it may therefore be inferred Foster City had the power to terminate him. (Lab. Code, § 2922.) Harrison presented no evidence the County could have fired Dal Porto, or even removed him from his rotation on the GTF.[7]

Fifth, it is undisputed that Foster City paid Dal Porto his regular paycheck while he was assigned to the GTF. Harrison presented no evidence the County compensated Dal Porto in any way for his service on the GTF, and the Agreement suggests otherwise.

Sixth, the work did not last for a substantial duration, as in *Kowalski*, where the unskilled laborer worked at the special employer's site for more than a year. (*Kowalski, supra,* 23 Cal.3d at p. 179, fn. 11.) Officer Dal Porto was on loan to the GTF for only one week when the accident occurred.

Seventh, Dal Porto was a skilled employee unlike the unskilled workers in *Kowalski* and *Brassinga*. (*Kowalski*, *supra*, 23 Cal.3d at pp. 177, 179; *Brassinga*, *supra*, 66 Cal.App.4th at p. 218.) The more skilled the worker, the more reasonable it is to infer that he or she exercised independent judgment and discretion rather than simply following the orders of the alleged special employer. (*Brassinga*, *supra***,** at p. 217.) Police officers are highly skilled and must be trusted by the hiring entity to make on-the-

---

[7] Even the power to remove a worker from a temporary assignment is not enough to establish a special employment relationship. (*Kowalski*, *supra*, 23 Cal.3d at p. 177, fn. 9.) The alleged special employer must have the power to terminate the worker permanently. (*Ibid.*)

spot judgments involving enormous discretion. This fact argues forcefully against finding a special employment relationship. (*Ibid.*)

And finally, the eighth *Kowalski* factor looks to whether the employee consented to a joint employer relationship. (*Kowalski, supra,* 23 Cal.3d at p. 178.) The employee's awareness that his day-to-day work was directed by the alleged special employer is not enough. The pertinent question is whether the employee believed that an employer-employee relationship had been established. (*Id.* at p. 179.) Dal Porto believed he was a Foster City Police Department employee; Harrison presented no evidence that Dal Porto believed he was also a County employee or a Sheriff's Office employee.

After briefing was completed in this case, the Supreme Court issued an opinion discussing special employment principles in a somewhat similar context, which further reinforces our view that no special employment relationship existed in this case. (*CHP*, *supra*, 60 Cal.4th at p. 1007.) The issue there was whether the California Highway Patrol (CHP) is a special employer of tow truck drivers working on the CHP's Freeway Service Patrol (FSP) program, which is a statutorily established program providing free emergency roadside assistance on California's busiest highways. (See Sts. & Hy. Code, § 2560 et seq.) By law, the FSP program is jointly administered by California's Department of Transportation (Caltrans), the CHP, and local transportation agencies. (*CHP*, *supra*, 60 Cal.4th at p. 1007.) Caltrans manages statewide funding, planning, and coordination. CHP trains the tow truck drivers, supervises field operations, and may provide dispatchers. Local agencies contract with privately owned tow services, which hire and assign the drivers and provide trucks dedicated solely to the FSP program. (*Ibid.*) In *CHP*, California Coach Orange, Inc. (California Coach) hired and provided drivers as well as tow trucks for the FSP program through contractual relations with the Orange County Transportation Authority (OCTA). CHP provided field supervision, program management, and oversight of contractor service quality. (*Id.* at p. 1007.) A California Coach tow-truck driver hit a car, injuring a woman and her child. The injured parties sued the driver, California Coach, OCTA, CHP and Caltrans. CHP moved for summary judgment on the sole question of whether it was the driver's "special

18

employer." (*Ibid*.)  The trial court denied summary judgment, finding triable issues of fact. (*Ibid.*)

The CHP was allowed to present a certified question of law to the Court of Appeal (Code Civ. Proc., § 166.1): "whether the statutes establishing the FSP program are inconsistent with a finding that CHP is the special employer of an FSP tow truck driver." (*CHP*, *supra*, 60 Cal.4th at pp. 1007–1008.)  Ruling the CHP was not a special employer as a matter of law, the Court of Appeal directed entry of summary judgment.  (*Ibid*.)  The Supreme Court reversed, agreeing the FSP statutes are "incompatible" with CHP being the driver's special employer (*id.* at p. 1008), but holding this did not "eliminate the possibility that CHP might act as a special employer if it takes on responsibilities beyond those outlined in the FSP statutes."  (*Id*. at p. 1015.)  The case was returned to the trial court to determine whether CHP "agree[d] to a role that would bring it within the scope of the special employment doctrine."  (*Ibid*.)

We find *CHP* both similar and dissimilar.  It is similar in that it discusses potential liability in a cross-jurisdictional governmental project and determines a question of special employment for one participating government entity, where that entity, together with other entities, provided services toward accomplishing a common goal.  The case is significant because, despite the larger role played by CHP in training and overseeing FSP tow-truck drivers, the Supreme Court found there was no special employment created by the statutes, which were in fact "incompatible" with a special employment relationship. (*CHP*, *supra*, 60 Cal.4th at p. 1008.)  This strengthens our conviction that adopting the Resolution, drafting the unsigned Agreement, and drafting the GTF Manual did not make the Sheriff's Office a special employer of city police officers on loan to the GTF.  The role envisioned under the documents surrounding the GTF's formation and operation was one of co-equal entities, each agreeing to contribute officers and other resources to a common purpose, in which each would be responsible for its own employees but would not incur liability for the torts of any other participating entity's employees.

But under *CHP*, the question remains whether the Sheriff's Office possibly undertook in actuality a role larger than that described in the Agreement, thereby raising

19

a triable issue on whether the County had assumed a duty of care towards Harrison for Dal Porto's alleged negligence. (*CHP*, *supra*, 60 Cal.4th at p. 1015.) This case is dissimilar to *CHP* because Captain Gallagher's declaration proved prima facie that the GTF operated consistently with the documents surrounding its formation, and Harrison presented no evidence the Sheriff's Office took on a larger role. *CHP* further convinces us the County was not a special employer of Dal Porto as a matter of law.

###### D. *Dal Porto was an independent contractor and was not the County's agent*

Harrison also argues there was an "inherent agency relationship" created between the County and Dal Porto based on the unsigned Agreement. "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295; see *Borders Online v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1189 (*Borders*); *Scholastic Book Clubs, Inc. v. State Bd. of Equalization* (1989) 207 Cal.App.3d 734, 737–738.) "An agency relationship may be implied based on conduct and circumstances." (*Borders, supra,* at p 1189; accord, *Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 214.)

Harrison treats the County's admission that Dal Porto was an independent contractor as a damning one, insinuating that the negligence of an independent contractor routinely gives rise to liability under section 815.4 on the part of the public entity that hired him. But this is true only to the extent a private party hiring the independent contractor would be liable (§ 815.4), and liability is the exception, not the rule (*Benson, supra,* 185 Cal.App.4th at p. 1188, fn. 5; *McCarty*, *supra*, 164 Cal.App.4th at p. 970). Here we find no evidence raising a triable issue of fact that the exception applies.

Section 3353 of the Labor Code defines an independent contractor as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." Unlike in an employment relationship, an individual or entity that hires an independent contractor ordinarily is not liable for the acts of the independent

20

contractor. (*Benson*, *supra*, 185 Cal.App.4th at p. 1188, fn. 5; *McCarty*, *supra*, 164 Cal.App.4th at p. 970.) Central to this rule is the fact that an independent contractor exercises his or her own discretion and judgment in performing services rather than following detailed orders from the hirer. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 670; *Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1107; *McCarty*, *supra*, 164 Cal.App.4th at p. 970.)

Thus, the right of the person to whom services are rendered to control the manner and means of accomplishing the desired result is the foremost factor for determining whether the person performing the work is an employee or an independent contractor. (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*); *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 852 (*Antelope Valley Press*).) However, many secondary factors are also relevant, including various indicia of the skill and independence of the worker and the degree of control exercised by the hiring entity.[8] (*Ayala*, *supra*, at p. 532; *Antelope Valley Press*, *supra*, at p. 853.) But as Harrison notes, citing *City of Los Angeles v. Meyers Brothers Parking System* (1975) 54 Cal.App.3d 135, 138 (*Meyers Brothers*) and *Mottola v. R. L. Kautz & Co.* (1988) 199 Cal.App.3d 98, 108 (*Mottola*), unlike the categories of employee and independent contractor, which are

---

[8] Those indicia include whether the hiring entity had "(1) the right to discharge at will, without cause; (2) whether the person performing the services is engaged in a distinct occupation or business; (3) whether such person has made a substantial investment in his or her business, other than his or her services; (4) whether that person is the one that is best situated to distribute the risk and cost of injury as an expense of doing business; (5) whether the work, in the given locale, is usually performed under the supervision of a principal; (6) the skill required in the occupation; (7) whether the remuneration given to the person providing the services depends on his or her initiative, judgment or managerial abilities; (8) whether the principal or the worker supplies the tools, equipment and place of work; (9) the length of time that the services will be performed; (10) whether payment is by the job or by a unit of time; (11) whether the work is part of the principal's regular business; (12) whether the person performing the services hires his or her own workers; and (13) whether the parties believe they are operating in an employer-employee relationship." (*Antelope Valley Press*, *supra*, 162 Cal.App.4th at p. 853, citing *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350–355.)

mutually exclusive, "[a]gency and independent contractorship are not *necessarily* mutually exclusive legal categories." (*Meyers Brothers, supra,* at p. 138.)

Harrison's reliance on *Meyers Brothers* and *Mottola* is misplaced. *Meyers Brothers* involved a company that managed and operated certain parking facilities belonging to Century City, Inc. (Century City). (*Meyers Brothers, supra,* 54 Cal.App.3d at p. 137.) Under their agreement, Meyers Brothers hired and supervised the workers at the parking facilities, supplied and maintained their equipment, and obtained insurance as dictated by Century City, with all of the above being at Century City's expense. (*Id.* at p. 138.) However, Century City also maintained control of the budget for the parking facilities, controlled the "operating policy" of the parking facilities, and retained the right to request termination of any Meyers Brothers employee, which Meyers Brothers was required to facilitate through the employee's union. (*Id.* at pp. 138–139.) The agency relationship was not recognized for purposes of ascribing tort liability to Century City but rather for purposes of determining how much Meyers Brothers owed in business taxes. (*Id.* at p. 137.) Given the much greater control Century City exercised, that Meyers Brothers was held to be an agent of Century City for certain tax purposes does not lead to the same conclusion with respect to the County's relationship with Dal Porto. Similarly, in *Mottola*, the court held "an independent claims adjuster is simply the alter ego of the self-insured employer." (*Mottola, supra,* 199 Cal.App.3d at p. 108.) Dal Porto was not the alter ego of the County.

" "[T]he existence of an agency relationship is usually a question of fact, *unless the evidence is susceptible of but a single inference*.' " (*Borders*, *supra*, 129 Cal.App.4th at p. 1189.) For many of the same reasons already discussed, we conclude as a matter of law that Dal Porto was not the County's agent. The decisive factors are (1) the Sheriff's Office did not control the specifics of Dal Porto's job performance; (2) Dal Porto was not rendering services as part of the Sheriff's ordinary business; and (3) Dal Porto was a skilled employee invested with much discretion. Because Harrison offers no evidence that the Sheriff's Office actually assumed a role in the GTF beyond that ascribed to it in

22

the Agreement, none of his evidence raises a triable issue that Officer Dal Porto was an agent of the County.

## IV. The Court Did Not Err by Considering Public Policy in Determining Whether the County Owed a Duty to Harrison

Harrison's final claim calls into question the trial court's analysis of whether the County owed Harrison a duty because the court cited only a New York case in support: *H. R. Moch Co. v. Rensselaer Water Co.* (1928) 247 N.Y. 160, 167–169 [159 N.E. 896, 898–899] (*Moch*), one of Justice Cardozo's pioneering opinions in the law of torts.  (See also *Palsgraf v. Long Island R. Co.* (1928) 248 N.Y. 339, 340–342 [162 N.E. 99, 99–100]; *MacPherson v. Buick Motor Co.* (1916) 217 N.Y. 382, 384–392 [111 N.E. 1050, 1051–1054].)  *Moch* involved a water company's alleged failure to supply sufficient water pressure at one of the city's fire hydrants, resulting in the inability of firefighters to extinguish a fire in the plaintiff's warehouse, which was completely destroyed.  (*Moch, supra,* 159 N.E. at p. 896.)  In holding the water company, though under contract to provide water to the city, owed no duty of care to the plaintiff property owner, *Moch* held that imposing liability would "unduly and . . . indefinitely extend[]" the "zone of duty." (*Id.* at pp. 898–899.)  Apparently because the trial court mentioned public policy reasons consistent with the approach taken in *Moch*, Harrison argues that the court fashioned some sort of judicially-created governmental immunity to tort liability on public policy grounds.  This is a mischaracterization not only of what we understand the trial court to have meant, but also of *Moch*.

Nowhere in *Moch* does Justice Cardozo speak of public policy.  The focus in that case is on foreseeability.  If a tort duty were to extend as far as the plaintiff urged in *Moch*, Justice Cardozo explained, "The dealer in coal who is to supply fuel for a shop must then answer to the customers if fuel is lacking.  The manufacturer of goods, who enters upon the performance of his contract, must answer . . . not only to the buyer, but to those who to his knowledge are looking to the buyer for their own sources of supply.  Every one making a promise having the quality of a contract will be under a duty to the promisee by virtue of the promise, but under another duty, apart from contract, to an

23

indefinite number of potential beneficiaries when performance has begun. The assumption of one relation will mean the involuntary assumption of a series of new relations, inescapably hooked together. . . . [W]e may say in the words of the Supreme Court of the United States, 'The law does not spread its protection so far.' " (*Moch*, *supra*, 159 N.E. at p. 899, quoting *Robins Dry Dock & Repair Co. v. Flint* (1927) 275 U.S. 303, 309 (Holmes, J.).)

We take from the trial court's reference to *Moch* that it was addressing the existence of a tort duty as a matter of law, and we understand Harrison to question whether it was appropriate to take public policy into account in deciding that issue. We have no doubt it was. (See, e.g., *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 335–344 [retail store had no duty to provide defibrillators for customers who might suffer cardiac arrest in the store, in part because it would impose an undue burden on retailers].) In California, we follow the rule of *Rowland v. Christian* (1968) 69 Cal.2d 108, which takes account of a variety of factors in assessing whether a duty was owed, including what must be deemed public policy concerns: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, *the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach*, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at p. 113, italics added; *Verdugo v. Target Corp.*, *supra*, 59 Cal.4th at p. 338, fn. 19; see *id.* at pp. 344–345 (conc. opn. of Werdegar, J.); see generally, *Adams v. City of Fremont*, *supra*, 68 Cal.App.4th at pp. 265–288 [no duty imposed on police officers to attempt to dissuade suicidal person in possession of weapon from committing suicide].) Although the injury to Harrison was foreseeable and certain, Harrison has demonstrated no connection between the County's conduct and his injury, nor has he shown morally blameworthy conduct by the County. Thus, the *Rowland v. Christian* factors other than the policy regarding "the extent of the burden to the

defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach" appear to be fairly equally balanced.

Accordingly, the weighty policy rationale for not imposing on the County a duty of care to Harrison—promoting interagency cooperation in law enforcement without exposing participating agencies to additional liability—properly was allowed to tip the scales in granting summary judgment to the County. As the trial court found, if a duty of care were to be imposed on the County based on its mere participation as a co-equal in an interagency task force, it would discourage law enforcement agencies from implementing innovative, coordinated law enforcement measures to address public safety issues across jurisdictional lines. On Harrison's side of the scale there is only his private interest in recovering for his injuries. Although *Rowland v. Christian* calls for consideration of "the policy of preventing future harm" (69 Cal.2d at p. 113), it is not clear to us how that policy would be more effectively advanced by imposing liability on the County, in addition to Foster City. Nor is it clear why a motorist involved in an accident with a police car driven by an officer assigned to the GTF should have access to a broader range of defendants and potentially a larger recovery than one involved in an accident with the same officer while on regular duty with a city police department.

### DISPOSITION

The judgment is affirmed.

_____
Streeter, J.

We concur:

_____
Ruvolo, P.J.

_____
Rivera, J.

A140671/*Harrison v. County of San Mateo*

26